**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

ROSANGELA RIVERA-TORRES ET AL.,

   Plaintiffs,

         v.                           **Civil No. 13-1684 (SEC)**

DR. WILLIAM RUIZ-VALE, ET AL.

   Defendants.

## OPINION AND ORDER

Before the Court are the Presbyterian Community Hospital, Inc.'s (the Hospital or PCH) first and second motions for partial summary judgment, Docket ## 147 & 150. After reviewing the filings and the applicable law, PCH's first motion is **granted** and its second motion is **granted in part** and **denied in part.**

### I.    Factual and Procedural Background

Rosángela Rivera's second pregnancy was not without complications. At nineteen weeks of gestation, her membrane ruptured spontaneously and almost two months later, she was hospitalized for decreased fetal movement. With evidence of a thin watery discharge, she was diagnosed with "high leak." On August 25, 2010, at thirty-three weeks, Rivera had an extremely low "amniotic fluid index," a condition known as "severe oligohydramnios," which created a "real risk that [the baby] could become compressed in her mother's womb and suffer severe damage." Docket # 130, ¶ 19. The next day, Rivera gave birth to her daughter V.O.R..

Because V.O.R. was premature, she was admitted to PCH's Neonatal Intensive Care Unit (NICU). The first day, the medical staff at NICU told Rivera that the baby was doing well and that "she was a big girl considering that she was premature." Docket # 146, ¶ 9. Two days later, V.O.R. started showing respiratory complications. A

head sonogram revealed a type IV intraventricular hemorrhage in the left lobe. As a result, V.O.R.'s head started expanding at an alarming rate of half an inch per day, which prompted the doctors to remove brain liquid from her head. At some point, Rivera was told that V.O.R. had to be evaluated by a pediatric neurosurgeon and on September 14, 2010, V.O.R. was transferred to the Children's Hospital at Puerto Rico Medical Center.

Today, V.O.R. is five years old. Tragically, her intellectual development is significantly lower from that of a normal child of that age. She also suffers from severe physical disabilities including renal and hematological problems, blindness, and multiple daily convulsions, among others, all of which impair her ability to perform most of the basic human activities.

On September 6, 2013—more than three years after V.O.R.'s birth—Rivera filed this medical malpractice suit on her own behalf and on behalf of her children, V.O.R. and M.M.R. (V.O.R.'s sister) (collectively, Plaintiffs). The complaint named PCH, Pediatrix Medical Group of Puerto Rico, PSC (the entity in charge of PCH's NICU), Dr. William Ruiz (Dr. Ruiz) (the obstetrician and gynecologist in charge of Rivera's prenatal care and delivery), Dr. East Mere (Dr. Mere) (the obstetrician and gynecologist that covered when Dr. Ruiz was absent), and several neonatologists who intervened in V.O.R.'s postnatal care, as the defendants.

Plaintiffs allege that V.O.R.'s damages were caused by the combined negligence of all the defendants. Specifically, they posit that Dr. Ruiz and other PCH employees were negligent for waiting too long to deliver V.O.R. They also assert that the neonatologists failed to recognize signs of excess liquid in V.O.R.'s brain and to refer her to a pediatric neurologist or neurosurgeon in a timely fashion.

In due course, PCH filed two motions for partial summary judgment. In its first motion, the Hospital contends that Rivera's personal claims are time barred by the one-year statute of limitations for tort actions under Puerto Rico law. In its second motion,

PCH argues that it cannot be held liable for any negligence attributable to Dr. Ruiz and Dr. Mere. The Court addresses each motion sequentially.

## II.   Standard of Review

Summary judgment is appropriate only if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At this stage, it is axiomatic that courts "may not weigh the evidence," Casas Office Machs., Inc. v. Mita Copystar Am., Inc., 42 F.3d 668 (1st Cir. 1994), and must construe the record in the "light most flattering" to the nonmovant. Soto-Padró v. Public Bldgs. Authority, 675 F.3d 1, 2 (1st Cir. 2012). A court must similarly resolve all reasonable inferences in favor of the non-moving party. Tolan v. Cotton, 134 S.Ct. 1861, 1863 (2014) (per curiam).

Once the movant properly configures a summary-judgment motion, the burden shifts onto the nonmovant—or "the party who bears the burden of proof at trial," Geshke v. Crocs, Inc., 740 F.3d 74, 77 (1st Cir. 2014)—to "point to competent evidence and specific facts to stave off summary judgment." Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London, 637 F.3d 53, 56 (1st Cir. 2011). So the nonmovant cannot rest on conclusory allegations and improbable inferences. Advanced Flexible Circuits, Inc. v. GE Sensing & Inspection Technologies GmbH, 781 F.3d 510, 516 (1st Cir. 2015). Neither "effusive rhetoric," Cadle Co. v. Hayes, 116 F.3d 957, 960 (1st Cir. 1997), nor "arguments woven from the gossamer strands of speculation and surmise," RTR Technologies, Inc. v. Helming, 707 F.3d 84, 93 (1st Cir. 2013), suffice to forestall the entry of summary judgment. Failure to shoulder this burden "allows the summary judgment engine to operate at full throttle." Lawton v. State Mut. Life Assur. Co., 101 F.3d 218, 223 (1st Cir. 1996).

## III.   Applicable Law and Analysis

### a.   The timeliness of Rivera's claim

Sitting in diversity jurisdiction, the Court must apply the "[Commonwealth's] substantive law and federal rules for procedural matters." Alejandro-Ortiz v. Puerto

Rico Elec. Power Auth., 756 F.3d 23, 26 (1st Cir. 2014). Because in Puerto Rico, the statute of limitations is not a procedural matter but rather an issue of substantive law, see Vera v. Dr. Bravo, 161 D.P.R. 308, 321, P.R. Offic. Trans. (2004), Commonwealth law applies.

Medical malpractice claims are actionable under the Commonwealth's general tort statute, see id. at 322, which provides a one-year statute of limitations. P.R. Laws Ann. tit. 31, § 5298. This statute of limitations is triggered when the aggrieved person possesses "information sufficient to permit suit." Villarini–García v. Hospital del Maestro, 8 F.3d 81, 84 (1st Cir. 1993). That is, when the putative plaintiff has knowledge of all the elements necessary to effectively assert his or her cause of action, see Vera 161 D.P.R. at 324, including "knowledge of the wrong and a causal link between the wrong and some harm," Villarini-García, 8 F.3d at 84, and knowledge of "the likely identity of the tortfeasor." Espada v. Lugo, 312 F.3d 1, 3 (1st Cir. 2002). But "actual knowledge is not required where, by due diligence, such knowledge would likely have been acquired." Villarini-García, 8 F.3d at 84. "Once a plaintiff is made aware of facts sufficient to put her on notice that she has a potential tort claim, she must pursue that claim with reasonable diligence, or risk being held to have relinquished her right to pursue it later, after the limitation period has run." Rodríguez-Surís, 123 F.3d at 16.

Because Rivera filed this action "more than a year after the injury took place, she bears the burden of proving that [despite due diligence,] she lacked the requisite 'knowledge' at the relevant times." Torres v. E.I. Dupont De Nemours & Co., 219 F.3d 13, 19 (1st Cir. 2000) (citations omitted).

PCH proposes three approximate dates when Rivera's claim accrued for purposes of starting the statute of limitations. First, the Hospital argues that her claim accrued on August 26, 2010, shortly after V.O.R.'s birth. Alternatively, it posits that the limitations clock began to run on August 17, 2011, when she received the medical records from PCH. At the latest, the Hospital maintains, the clock started when Rivera

retained counsel, sometime before November 2011. Because Rivera filed this action on September 6, 2013, if her claim accrued on any of these dates, her action would be time-barred.

Rivera, on the other hand, argues that her claim did not accrue until September 17, 2012, the date when she received Dr. Carolyn Crawford's expert report. Before then, Rivera posits, she could not have known that V.O.R.'s injuries were a result of medical negligence. Docket # 175, p. 9.

As a threshold matter, the Court must first determine the date when Rivera was "made aware of facts sufficient to put her on notice that she has a potential tort claim," thereby commencing her duty to diligently investigate and uncover the elements of her cause of action. Rodríguez-Surís, 123 F.3d at 16.

Here, Rivera was on notice of her potential tort claim shortly after V.O.R.'s birth. Before delivery, Rivera knew that she had a low level of amniotic fluid. Despite multiple attempts to inform Dr. Ruiz of the results, he did not appear until five days later; the same day that he delivered V.O.R. Two days after birth, the doctors at the NICU explained to Rivera that V.O.R. had type IV intraventricular hemorrhage and that they were removing liquid from her head because it was expanding at a rate of half an inch per day. Docket # 146, ¶¶ 13-14. This physical manifestation of V.O.R.'s injury put Rivera on notice of her potential tort claim. See Kaiser v. Armstrong World Indus., Inc., 872 F.2d 512, 516 (1st Cir. 1989) ("Notice of the injury occurs when there exist some outward or physical signs through which the aggrieved party may become aware and realize that he has suffered an injurious aftereffect.").

Moreover, from the date of V.O.R.'s birth until she moved to Texas on November 2011, Rivera was told that her daughter was blind, that her kidneys were not functioning well, and that she was having fifteen seizures per day. Before moving to Texas, Rivera told her father and cousin that she suspected that V.O.R.'s condition was caused by Dr. Ruiz's delay who did not attend to her promptly despite her prenatal difficulties. By the time she retained Counsel—sometime before November 2011—

Rivera "was sufficiently concerned about the possibility of a malpractice claim that she had sought the services of an attorney to protect her legal rights." Reyes Santana v. Hosp. Ryder Mem'l, Inc., 130 F. Supp. 2d 270, 275 (D.P.R. 2001). Indeed, in her first meeting with counsel, they discussed the possibility of filing a complaint.

Given the facts stated above, Rivera's allegation that it was not until V.O.R.'s second birthday that she noticed that her daughter "was not a normal child," and that she realized that "it was going to be very hard," Docket # 175, p. 7, is incredible. In any event, it is also irrelevant; "[t]he scope and extent of the damage need not be known in order to attribute such discovery to a person." Vera, 161 D.P.R. at 325. Rather, they "may be established later on, in the course of the legal proceedings held for the purpose of seeking redress." Id. At bottom, Rivera's willful blindness or self-induced ignorance "[did] not interrupt the limitations period." Fragoso v. Lopez, 991 F.2d 878, 886-87 (1st Cir. 1993).

Having established that Rivera was on notice of her potential claim shortly after V.O.R.'s birth and certainly by the time that she retained counsel, Rivera's claim will be time-barred unless she is able to demonstrate that she lacked the requisite knowledge, despite due diligence. See Rodríguez-Surís, 123 F.3d at 16. The Court, thus, proceeds to evaluate whether Rivera and her counsel performed a diligent investigation to uncover the elements of her cause of action in a timely fashion. The record reveals otherwise.

First, Rivera waited until August 16, 2011—almost a year after V.O.R.'s birth—to obtain copies of the relevant medical records, and more than a year to retain counsel. See Rodríguez-Surís, 123 F.3d 10, 16 (the "plaintiff's failure to consult with a lawyer or otherwise investigate the claim to which she had been alerted by the factual circumstances associated with the operation barred her from commencing that claim in the courts over one year after being on notice"). Further, it was not until early 2012—

Plaintiffs do not say exactly when—that Rivera's counsel retained a medical expert to evaluate the medical records. Rivera proffered no valid explanations for these delays.[1]

Faced with the lack of evidence to shoulder her burden of proving due diligence, Rivera argues that her failure to pursue a diligent investigation is excusable because the neonatologists deliberately misled her "to believe that the baby's injurious damages were a result of her prematurity" to hide that they were caused by medical malpractice. Docket # 175, p. 3. This argument is based on the neonatologists' alleged statements that V.O.R. was in the NICU "because she was premature," and that her complications were due to her prematurity. Docket # 175, pp. 3-5

It is true that Puerto Rico law "recognizes an exception to applicability of the concepts of notice and deemed knowledge for circumstances in which a plaintiff's failure to make a timely filing of a claim is reasonably based upon the assurances of the person who caused the injury." Rodríguez-Surís, 123 F.3d at 14 (citing Colón Prieto v. Géilgel, 15 P.R. Offic. Trans. 313, 329–30). This exception—which is similar to the common law doctrine of fraudulent concealment—"safeguard[s] the aggrieved party's right to seek redress, while…[it] abstain[s] from rewarding the person who, having caused the damage, [takes] refuge in his patient's trust and ignorance trying to avail himself of the circumstances in order to defeat the action." Colón Prieto 15 P.R. Offic. Trans. at 330.

Rivera's fraudulent concealment argument lacks force. At the outset, Rivera proffers no evidence that the neonatologists suspected that V.O.R.'s injuries were a result of medical negligence. Thus, there is zero proof that the neonatologists were "trying to avail [themselves] of the circumstances in order to defeat [this] action." Colón Prieto 15 P.R. Offic. Trans. at 330.

---

[1] The only attempt to explain these delays are Rivera's personal circumstances in the year following V.O.R.'s birth. See Docket # 175, pp. 8-9 ("it had been a very difficult year… everything was happening to quickly… there were many doctor's appointments… V.O.R. was not developing any kind of ability… [V.O.R.'s father] left… because he could not handle the situation."). While the Court sympathizes with Rivera's situation, sympathy alone cannot carry the day. Barring circumstances that may have prevented knowledge of her injury, Rivera's personal circumstances are irrelevant for determining the accrual date of her cause of action.

Moreover, taken in context, the neonatologists' statements, which were allegedly made shortly after V.O.R. was transferred to the NICU, are neither necessarily false nor misleading as to the reasons for V.O.R.'s complications. But even if their earlier statements were somehow misleading, Rivera candidly admits that at some point, one of the neonatologists at the NICU suggested that V.O.R.'s type IV hemorrhage might have not been related to her prematurity. Apparently, this illness is common in smaller premature babies weighing approximately one or two pounds. But, weighing five pounds, the neonatologist said, V.O.R. was "the biggest of the premature babies." Docket # 146-1, pp. 23-24. In that moment, Rivera should have at the very least suspected that V.O.R.'s ventricular hemorrhage was caused by something other than her prematurity. Then, it was unreasonable for Rivera to rely on the neonatologists' previous statements. See Rodríguez-Surís, 123 F.3d at 17.

Rivera also suggests that the neonatologists misled her because none of them told her that V.O.R.'s conditions were a result of medical malpractice. See Docket # 175, pp. 5-6 ("it is clear that the statute of limitations was tolled by the [neonatologists'] misleading representations… that [V.O.R.'s] damages were caused by her prematurity and not by the doctor's negligence… "Not even one of [the doctors at the NICU] told [Rivera] that [V.O.R.'s] conditions where the result of negligence [by] one of [the] codefendants"). This argument borders on sophistry.

Even assuming that the neonatologists had some suspicion of medical negligence, no potential victim could seriously expect a doctor to confess or accuse a colleague of medical malpractice. It is naïve to believe that tortious conduct such as medical malpractice "would ever be so gratuitously revealed." Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp., 828 F.2d 211, 218-19 (4th Cir. 1987). Moreover, nothing in the record suggests that Rivera ever asked the neonatologists whether V.O.R.'s damages may have been negligently inflicted. To permit tolling "for an alleged failure to own up to illegal conduct upon this sort of timid inquiry would effectively nullify the statute of limitations." Id.

Next, Rivera argues that despite having retained counsel, her claim did not accrue until she received Dr. Crawford's expert report detailing the negligent acts and omissions of the various defendants. This argument has been rejected by at least two courts in this district. See Reyes Santana, 130 F. Supp. at 275 (the statute of limitations began, at the latest, the day after the plaintiff retained counsel, not when the attorney's medical expert concluded that the alleged negligent conduct contributed to the underlying injury); accord Morales v. St. Luke's Episcopal Hosp., 328 F. Supp. 2d 192, 197 (D.P.R. 2004) ("the one year starts to run no later than the date plaintiff retained counsel… regardless of when the expert report was obtained") (emphasis in the original).

Undeterred, Rivera urges this Court to ignore these cases arguing that there is no Puerto Rico Supreme Court jurisprudence strictly holding that the running of the statute of limitations begins from the moment a plaintiff retains counsel. Docket # 175, p. 10. Moreover, misconstruing the Puerto Rico Supreme Court decision in In Re: Guemárez Santiago, 191 D.P.R. 611 (2014), Rivera maintains that had she filed a complaint without an expert report, and the complaint had been dismissed as meritless, her counsel "could have been ethically sanctioned." Docket # 175, p. 12. But in Gremárez, the plaintiff's counsel was indefinitely disbarred for knowingly filing a frivolous medical malpractice action. In that case, the plaintiff's counsel failed to disclose two expert reports that she had obtained prior to filing suit, both of which exonerated the physician involved of any medical negligence. That is far from the case here and Gremárez is thus, inapposite.

To be sure, there may be cases where a plaintiff, even after having retained counsel, may not be able to ascertain all the elements necessary to file a medical malpractice suit without consulting with a medical expert. But accrual of a claim cannot wait until a physician renders an expert report. Otherwise, the start of the limitations period would depend on the competence, schedule, or work-ethic of a plaintiff's chosen medical expert.

In a case like this, where the plaintiff's efforts in prosecuting a claim begin close to a year after her injury, an attorney cannot delay filing suit until he has secured an expert report. Rather, the attorney should quickly hold a preliminary consultation with a medical expert to assist him in fashioning a pleading sufficient to survive a motion to dismiss. A full-blown report is not necessary to file suit, much less to start the statute of limitations.

What is worse, here, Rivera waited until September 6, 2013 to file suit. That is almost a year after securing Dr. Crawford's report (September 17, 2012), about a year and a half after retaining Dr. Crawford (early in 2012), almost two years after retaining counsel (sometime before November 2011), and more than three years after her injury (around August 26, 2013).[2] On this record, Rivera cannot shoulder her burden of showing that despite due diligence, she lacked the required knowledge to file suit.

In short, Rivera's failure to obtain medical records, consult with a lawyer, or otherwise investigate the claim "to which she had been alerted by the factual circumstances associated with [V.O.R.'s birth and postnatal care]," Rodríguez-Surís, 123 F.3d at 16, in a timely fashion, forecloses any possibility of tolling her cause of action. See Vera, 161 D.P.R. at 329 ("if the lack of knowledge that precludes the filing of the action is caused by the claimant's lack of diligence, then the liberal considerations on the limitations of actions are not applicable."). Thus, the Court holds that Rivera's action accrued shortly after August 26, 2010, when she was told that a type IV intraventricular hemorrhage was uncommon in premature babies weighing as much as V.O.R.[3] Having filed this suit over three years after her claim accrued, Rivera's action is time-barred and the Hospital's first motion for partial summary judgment is, therefore, granted. However, as PCH candidly concedes, because Puerto Rico law automatically tolls the accrual of a minor's cause of action until he or she

---

[2] Puzzlingly, Plaintiffs do not say exactly when they retained counsel or their medical expert.

[3] Precision as to the actual date is not important. Even if the Court held that Rivera's claim accrued a year later, on August 17, 2011, when she received the medical records or, at the latest, when she retained counsel sometime before November 2011, her action would be time-barred.

reaches adulthood, see P.R. Laws Ann. tit. 31, § 254, V.O.R.'s and M.M.R.'s claims are timely.

> b. <u>Whether the Hospital may be held liable for Dr. Ruiz and Dr. Mere's negligence</u>

As a general rule of Puerto Rico law,

> where a person goes directly to a physician's private office, agrees with him as to the treatment he or she is going to receive, and goes to a given hospital on the physician's recommendation merely because said institution is one of several which the physician has the privilege of using… the hospital should not be held liable for the exclusive negligence of [the] unsalaried physician, who was first and foremost entrusted with the patient's health.

<u>Márquez Vega v. Martínez Rosado</u>, 16 P.R. Offic. Trans. 487, 499 (1985).

This general rule, however, has an exception:

> Public Policy dictates that even in this type of situations the hospital has the *continuous obligation to protect the health of* its patients by: (a) carefully selecting the physicians who, for some reason or another, are granted the privilege of using its facilities; (b) requiring that said physicians keep up-to-date through professional advancement studies, (c) monitoring the labor of said physicians and taking action, when possible, in the face of an obvious act of malpractice; (d) discontinuing the privilege granted in the face of the repeated or crass acts of malpractice on the part of one of those physicians; and (e) keeping reasonably up-to-date on current technological breakthroughs.

<u>Id.</u>, p. 500 (italics in original) (internal citations omitted).

Because the Hospital's second motion for partial summary judgment remains unopposed, the Court is "obliged to take [its] statement of uncontested facts as true." <u>Vélez v. Awning Windows, Inc.</u>, 375 F.3d 35, 42 (1st Cir. 2004) p. 41-42, citing <u>Euromodas, Inc. v. Zanella, Ltd.</u>, 368 F.3d 11, 14–15 (1st Cir. 2004).

As such, the Court must conclude that Dr. Ruiz is not a PCH employee. As the story goes, once Rivera became aware of her pregnancy, she went directly to Dr. Ruiz's private office and agreed that he was going to be in charge of V.O.R.'s prenatal

care and delivery. In that meeting, Dr. Ruiz told Rivera that V.O.R. was going to be delivered at PCH because he saw his patients there. Rivera also signed a contractual agreement stating that she understood and agreed that Dr. Mere sometimes covered for Dr. Ruiz at the Hospital.

The uncontested facts reveal that Dr. Ruiz is a duly qualified physician specialized in obstetrics and gynecology. His medical license has never been limited, suspended, revoked, denied, or subject to probation. He has had medical privileges in various hospitals, including medical privileges at PCH since 2002, which have never been denied, revoked, or limited. Dr. Ruiz has never been subject of corrective or disciplinary action in any of the hospitals where he has had medical privileges or by the Puerto Rico Board of Examiners. Indeed, none of Plaintiffs' expert witnesses assert that PCH was negligent in granting medical privileges to Dr. Ruiz.

All of the above, together with Plaintiffs' failure to respond to the Hospital's motion, compels the Court to rule that the PCH may not be held liable for any negligent acts or omission attributable Dr. Ruiz regarding V.O.R.'s prenatal care or delivery. The same, however, does not follow as to PCH's liability for any negligence attributable to Dr. Mere because the uncontested facts reveal nothing regarding his relationship with PCH, his history of medical privileges, or his disciplinary record. In short, the Court is in no position to dictate summary judgment on this front. See Rivera-Torres v. Rey-Hernández, 502 F.3d 7, 13 (1st Cir. 2007) ("even an unopposed motion for summary judgment should not be granted unless the record discloses that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.").

## IV. Conclusion

For the reasons stated, PCH's first motion for summary judgment, Docket # 147, is **GRANTED**. PCH's second motion for summary judgment, Docket # 150, is **GRANTED in part** and **DENIED in part**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 30th day of June, 2016.

                                          *<u>s/ Salvador E. Casellas</u>*
                                          SALVADOR E. CASELLAS
                                          U.S. Senior District Judge